UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION


STRATEGIC MANAGEMENT HARMONY,  )
LLC, SUSAN HINDS, individually and as  )
CEO OF STRATEGIC MANAGEMENT  )
HARMONY, LLC, and BFC SOLUTIONS,  )
INC.,  )
                                       )
        Plaintiffs,  )
                                       )
    vs.  )        4:05-cv-0180-JDT-WGH
                                       )
                                       )
ENHANCED BUSINESS REPORTING  )
CONSORTIUM, INC., GRANT  )
THORNTON, LLP, PRICEWATERHOUSE  )
COOPERS, LLP, AMERICAN INSTITUTE  )
OF CERTIFIED PUBLIC ACCOUNTANTS,  )
and MICROSOFT, INC.,  )
                                       )
        Defendants.  )


**ENTRY ON DEFENDANTS' MOTIONS TO DISMISS (Doc. Nos. 88 & 91)**[1]


Plaintiffs Susan Hinds and BFC Solutions, Inc. ("BFC")[2] bring this action against

Defendants Enhanced Business Reporting Consortium, Inc. ("Consortium"), Grant

---

[1] This Entry is a matter of public record and will be made available on the court's web site.  However, the discussion contained herein is not sufficiently novel to justify commercial publication.

[2] Strategic Management Harmony is also named in the caption of this entry; however, Plaintiffs never presented in their brief, Complaint, or Amended Complaint a reason why Strategic Management Harmony has a claim against Defendants, except a vague notion that the business suffered as a result of Susan Hinds's taking a job with the Defendants.  Further, Plaintiffs in their brief make the specific statement "Strategic Management Harmony is no longer a party to this case . . . ."  (Pls.' Br. 21.)  The court takes this to be an admission by Plaintiffs that Strategic Management Harmony should be dismissed as a party.  Therefore, the court **DISMISSES** Strategic Management Harmony from the case, and further references to "Plaintiffs" are to Susan Hinds and BFC only.

Thornton, LLP ("Grant Thornton"), PricewaterhouseCoopers, LLP ("PWC"), the

American Institute of Certified Public Accountants ("Institute"), and Microsoft, Inc.

("Microsoft") for various federal and state law claims.  The motions discussed here were

made by Microsoft moving alone to dismiss pursuant to Rule 12(b)(6) of the Federal

Rules of Civil Procedure (Doc. No. 91) and the remaining defendants (collectively

referred to throughout this entry as "joint Defendants") moving together to dismiss

pursuant to Rules 12(b)(2), 12(b)(3) and 12(b)(6) of the Federal Rules of Civil

Procedure (Doc. No. 88).  The motions are now fully briefed and the court rules as

follows.

**Table of Contents**

I.      Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-

II.     Preliminary Matters—Jurisdiction and Venue  . . . . . . . . . . . . . . . . . . . . . . . . -5-
              A.      Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -6-
              B.      Venue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -9-

III.    Rule 12(b)(6) Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -18-

IV.     Discussion on the Merits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-
              A.      Title VII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-
                            1.      The Proper Title VII Defendants  . . . . . . . . . . . . . -20-
                            2.      Discrimination Based on Sex   . . . . . . . . . . . . . . . -28-
                            3.      Retaliation Claim . . . . . . . . . . . . . . . . . . . . . . . . . -30-
              B.      Equal Pay Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -32-
              C.      Breach of Contract Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . -34-
              D.      Defamation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -35-

V.      Award of Costs and Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -37-

VI.     Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -39-

## I.   Background

In the wake of Congress's passing the Sarbanes-Oxley Act, the Institute formed the Special Committee of Enhanced Business Reporting ("Special Committee").  The purpose of the Special Committee was to create, in the words of the Amended Complaint, a "New Global Business Reporting Model" and form a not-for-profit organization to administer it.  (Am. Compl. ¶ 14.)[3]  The leadership of the Special Committee was composed of executives of the Defendants.  These were Mike Starr, Managing Partner with Grant Thornton; Alan Anderson, Senior Vice President of the Institute; John O'Connor, Chairman of Services for PWC; and Bob Laux, Director of Financial Reporting for Microsoft.  The three Defendant businesses and the Institute provided funding for the Special Committee and promoted the work the Special Committee was doing.

In January 2003, Plaintiff Susan Hinds was asked to join the Special Committee as a volunteer and she began working with it to form the Enhanced Business Reporting Consortium ("Consortium"), which would be the not-for-profit corporation that administered the new global business reporting model developed by the Special Committee.  She was the only female on the Special Committee.

---

[3] Two complaints have been filed in this case.  The original Complaint was filed November 14, 2005 (Doc. No. 1), and an Amended Complaint was filed October 25, 2006 (Doc. No. 76).  All citations in this entry are to the Amended Complaint filed; however, the texts of the two complaints are identical.  The only change made in the Amended Complaint was dropping individual defendants Mike Starr, Alan Anderson, John O'Connor, and Bob Laux.

She alleges that the three Defendant businesses and the Institute provided funding, office space, and staff for the Special Committee.  According to the Amended Complaint, the Defendants, presumably through their agents on the Special Committee, also made decisions regarding employment and hiring employees.  There was also shared office space, staff, and assets.

Hinds claims that during her service with the Special Committee, male members of the committee were offered partnership opportunities with the Defendant businesses that she was denied.[4]  Further, companies owned by men on the Special Committee were awarded contracts while Hinds's company, Strategic Management Harmony, LLC, was not.

On the other hand, she was offered at least one exclusive opportunity through the Special Committee.  In July 2004, Hinds was hired to fill the role of CEO and President of the Consortium.  The Consortium had not yet been formed, and she negotiated her employment contract with Starr, Managing Partner with Grant Thornton.  As part of her agreement, she was to be an employee of Grant Thornton until the formation of the Consortium.  Grant Thornton agreed to pay her salary and withhold taxes until the Consortium had its own bank account.  The Institute agreed to reimburse Hinds for any "initial start up costs."  (Am. Compl. ¶ 38.)  Hinds also claims that the

---

[4]  Whether Hinds means that she was denied the opportunity to partner with the businesses in some sort of business venture or that she was denied the opportunity to join Grant Thornton or PWC as a partner is unclear.

agreement provided her "A 2 year right . . to renew [the] contract." (*Id.*)  Her

appointment was announced by Starr and Anderson in August 2004.

On August 18, 2004, Hinds had what she refers to as a "CEO transition meeting."

(Microsoft Ex. A, at 3.)  The same day she received a voice mail from a man breathing

heavily while calling her name.  It is unclear from the Amended Complaint or her earlier

EEOC charge why Hinds believed the voice mail was related to her employment.  Hinds

complained to Starr, although no action was taken.  Hinds also claims that she

complained about the unequal opportunities and compensation being offered her as

compared to those being given to male members of the Special Committee.

On September 4, 2004, before the Consortium had been incorporated as a not-

for-profit corporation, Starr notified Hinds that there had been a "realignment" and she

would not become the CEO of the Consortium.  (Am. Compl. ¶ 58.)  Hinds alleges that

she was sexually harassed after this.  She claims to have been kissed without her

consent on or about September 8, 2004, by a Special Committee member at a hotel in

Washington, D.C.  She also claims that she was subjected to obscene and offensive

materials, behavior, and language (although she does not give any details as to what

she is referring).  She says that when she complained about the offensive behavior, no

action was taken.  Instead, her employment was terminated with her last paycheck on

September 30, 2004.

On March 17, 2005, Hinds filed a charge with the EEOC alleging that Defendants

Consortium, Grant Thorton, Institute, and PWC discriminated against her based on her

sex and retaliated against her.  Her EEOC charge did not mention Defendant Microsoft.
It alleged all of the items above plus that she was kissed without her consent and
restrained by someone around October 28, 2004, at an event sponsored by the Institute
and that when she complained no corrective action was taken.  Also, during what she
considers her tenure as CEO, Hinds entered into a contract with Plaintiff BFC to perform
monthly bookkeeping functions.  According to the Amended Complaint and EEOC
charge, this contract was breached while contracts with male CPAs and professionals
were honored "in spite of poor performance."  (Microsoft Ex. A, at 3.)

Hinds alleged that she was retaliated against "in her attempt to report gender
discrimination and questionable business practices."  (*Id.*)  She claims that her demotion
from the CEO position on September 4, her termination on September 30, and the
Consortium's copyrighting a business plan she wrote while removing her name as an
author were all acts of retaliation.

On November 14, 2005, Plaintiffs filed their Complaint in United States District
Court for the Southern District of Indiana.  In it, they named not only the Defendant
businesses, the Institute, and the Consortium, but also their employees or partners
among the leadership of the Special Committee—namely, Mike Starr, John O'Connor,
Alan Anderson, and Bob Laux.  Microsoft and Laux filed a motion to dismiss on April 11,
2006, and the rest of the Defendants filed a motion to dismiss and a motion to transfer
venue on April 18, 2006.

On October 25, 2006, after the motions were fully briefed but before the court had ruled on them, Plaintiffs filed an Amended Complaint.  This Amended Complaint did not include the individual defendants; the only remaining defendants were Consortium, Institute, Grant Thornton, PWC, and Microsoft.  The Amended Complaint, like the original Complaint, alleged five claims.  The first claim was a claim for discrimination on the basis of sex under Title VII of the Civil Rights Act of 1964 ("Title VII").  The second claim was a claim of retaliation under Title VII.  The third claim alleged a violation of the Equal Pay Act.  The last two claims were claims under Indiana common law—one for breach of contract, the other for defamation.

The court denied the original motions to dismiss and transfer venue as moot. (Doc. No. 106.)  On January 17, 2007, Defendants submitted two motions to dismiss the Plaintiffs' Amended Complaint.  (Doc. Nos. 88 & 91.)  One motion was filed by Microsoft, the other by the remaining "joint Defendants."  Plaintiffs responded to both motions on February 22, 2007.  (Doc. No. 101.)  The Defendants replied March 15, 2007.  (Doc. Nos. 102 & 103.)

## II.   Preliminary Matters—Jurisdiction and Venue

Defendants ask for the court to dismiss the Amended Complaint on numerous 12(b) objections.  First, joint Defendants ask for dismissal pursuant to 12(b)(2), for lack of personal jurisdiction (although it appears to the court that they are really asking the court, in the event that it dismisses the federal claims, to decline to exercise its supplemental jurisdiction).  Second, joint Defendants ask for dismissal pursuant to

12(b)(3) for lack of venue.  Third, joint Defendants and Microsoft ask for dismissal pursuant to 12(b)(6) for failure to state a claim.  Because jurisdiction involves the court's power to hear the case, it will address jurisdiction first.  The court will then address venue before going on the merits of the case and the parties' motions to dismiss for failure to state a claim.

### A.   Jurisdiction

In their brief, joint Defendants ask the court to dismiss the Amended Complaint for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure.  (*See* Joint Def.'s Br. 2, 21.)  Joint Defendants make no argument in their briefs that the court lacks personal jurisdiction over the Defendants.[5]  Rather, they argue that "[i]n the absence of any surviving Federal claim, this Court may only exercise jurisdiction over Plaintiffs' common law claims for breach of contract and defamation where complete diversity exists between Plaintiffs and Defendants." (*Id.* at 21.)  Of course, this is not an attack on the court's jurisdiction at all, but rather an indirect request that the court decline to exercise supplemental jurisdiction over the remaining state law claims in the event that it dismisses all of the claims over which it has original jurisdiction.  *See* 28 U.S.C. § 1367(c)(3).

---

[5]  Nor does it appear to the court that there is an argument that the court lacks personal jurisdiction.  Grant Thornton and PWC admit they have partners based in Indiana.  (Gaffney Aff. ¶ 2; Starr Aff. ¶ 4.)  The Consortium, according to the Amended Complaint, employed Hinds in Indiana.  (Am. Compl. ¶ 4.)  The Amended Complaint alleges that the Institute does business in Indiana (*id.* ¶ 11), and the Institute has presented no evidence that would defeat personal jurisdiction.

In particular, joint Defendants attack Plaintiffs' jurisdictional allegation claiming that subject matter jurisdiction is based on both federal question jurisdiction pursuant to 28 U.S.C. § 1331[6] and diversity jurisdiction pursuant to 28 U.S.C. § 1332.  (*See* Am. Compl. ¶ 13.)  Defendants argue that there really is no diversity jurisdiction at all. Jurisdiction is the power to hear a case and ordinarily must be determined early, and at every stage of litigation.  *United Phosphorus, Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir.2003).  In ruling on a 12(b)(1) motion for lack of subject matter jurisdiction, the court "may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists."  *Ezekiel v. Michel*, 66 F.3d 894, 897 (7th Cir.1995) (quoting *Capitol Leasing Co. v. FDIC*, 999 F.2d 188, 191 (7th Cir.1993) (citation omitted)).

But even if the court analyzes the joint Defendants' objection for what it is, one based on a lack of subject matter jurisdiction, it fails.  Joint Defendants do not attack the court's original subject matter jurisdiction over the Federal Title VII and Equal Pay Act claims, which the court has pursuant to 28 U.S.C. § 1331.  Whether or not the court has diversity jurisdiction,[7] it has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over

---

[6]  Plaintiffs claim that jurisdiction is also based on 28 U.S.C. § 1343(a).  The purpose of § 1343(a) was to allow certain classes of cases regardless of the amount in controversy to be allowed in federal court at a time when there was an amount-in-controversy requirement for federal question jurisdiction.  *Cf. Myles v. United States*, 416 F.3d 551, 554 (7th Cir. 2005) ("Section 1343(a)(3) covers only civil rights claims against state actors and has had no legal effect since 1976, when Congress amended § 1331 to eliminate any amount-in-controversy requirement.").

[7]  And it appears that is does not.  Defendants are correct that for diversity purposes, a
(continued...)

Hinds's breach of contract and defamation claims because they form part of the same case or controversy.[8]  If the court later dismisses all of claims over which it has original jurisdiction, then it might decline to exercise its supplemental jurisdiction.  *See* 28 U.S.C. § 1367(c)(3).  Yet this is not because the court lacks subject matter jurisdiction, but because it may decline to exercise it.  This is what Defendants really want the court to do; so the court only need reach that issue if it dismisses all the Title VII and Equal Pay Act claims below.

There is one sticking point—the court is not convinced that BFC is a proper party to this action.  The Federal Rules of Civil Procedure allow plaintiffs to join in one action only "if they assert any right to relief jointly, severally, or in the alternative in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all these persons will arise in the action."  Fed. R. Civ. P. 20(a); *see also Harris v. Spellman*, 150 F.R.D. 130, 131-32 (N.D. Ill. 1993).  The court may sua sponte drop a party from the suit "on such terms as are just."  Fed. R. Civ. P. 21.

---

[7](...continued)
partnership is a resident of every state in which its partners reside.  *Ind. Gas Co. v. Home Ins. Co.*, 141 F.3d 314, 316 (7th Cir. 1998).  Grant Thornton and PWC have provided evidence that they have partners in Indiana therefore there is not complete diversity.  (Gaffney Aff. ¶ 2; Starr Aff. ¶ 4.)  Therefore, the only basis for jurisdiction over the breach of contract claim and the defamation claim would be supplemental jurisdiction.

[8]  Lest there be any confusion, the court has subject matter jurisdiction over the claims regardless of what it later decides about Defendants' statuses as Hinds' employer.  *See Arbaugh v. Y & H Corp.*, 546 U.S. 500 (2006).

BFC's claim of breach of contract cannot be considered the same transaction or occurrence as Hinds's claims against the Defendants, nor do the claims involve a common question of law or fact.  Whether the Defendants are liable to BFC on a breach of contract claim is a distinct question from whether the Defendants discriminated against and defamed Hinds in her employment.  Although Hinds claimed in her EEOC charge that Defendants' refusal to honor the contract of BFC is an example of their hostility to women (Microsoft Ex. A, at 3.), this is not the same as a "series of transactions or occurrences."  *Cf. Papagiannis v. Pontikis*, 108 F.R.D. 177, 179 (N.D. Ill. 1985).  Therefore, the court will sever the parties' claims.  *See Elmore v. Henderson*, 227 F.3d 1009, 1012 (7th Cir. 2000).

It is also not clear to the court that a federal court would have jurisdiction to hear BFC's contract claim on its own.  There is no federal question jurisdiction and nowhere do the Plaintiffs provide what the citizenship of BFC is for purposes of diversity jurisdiction.  Therefore, BFC must file a new complaint adequately alleging subject matter jurisdiction within twenty days, or the court will dismiss the BFC's complaint for lack of subject matter jurisdiction.  *See* Fed. R. Civ. P. 12(h)(3).  The remainder of this entry will pertain exclusively to Hinds's claims against the Defendants.

**B.     Venue**

Next, joint Defendants ask the court to dismiss the Amended Complaint for improper venue pursuant to Rule 12(b)(3) of the Federal Rules of Civil Procedure; in the alternative, they ask for transfer of venue pursuant to 28 U.S.C. § 1404(a).  The court

-9-

addresses the 12(b)(3) motion first.  A district court in the Seventh Circuit has described

the standard for reviewing a motion under 12(b)(3):

> When a defendant challenges venue, the plaintiff bears the burden
> of establishing that venue is proper.  A court may examine facts outside
> the complaint in order to determine whether venue is proper.  Moreover, in
> resolving a motion to dismiss pursuant to Rule 12(b)(3), the court must
> resolve any factual conflicts in the parties' submissions in favor of the
> plaintiff and draw any reasonable inferences from those facts in the
> plaintiff's favor.

*Moore v. AT&T Latin Am. Corp.*, 177 F. Supp. 2d 785, 788 (N.D. Ill. 2001) (quoting *First*

*Health Group Corp. v. Sanderson Farms, Inc.*, No. 99 C 2926, 2000 WL 139474, at *2

(N.D. Ill. Jan. 31, 2000)).

According to 42 U.S.C. § 2000e-5(f)(3) there are three places where a Title VII

claim may be brought: "[1] in any judicial district in the State in which the unlawful

employment practice is alleged to have been committed, [2] in the judicial district in

which the employment records relevant to such practice are maintained and

administered, or [3] in the judicial district in which the aggrieved person would have

worked but for the alleged unlawful employment practice."  Yet if the defendant is not in

any of these districts, then the action can be bought in the district where the defendant

has its principal place of business.  *Id.*

This venue provision is the exclusive venue provision for Title VII, the general

venue provisions of 28 U.S.C. § 1391 is inapplicable.  *Gwin v. Reynolds & Reynolds*

*Co.*, No. 01 C 770, 2001 WL 775969, at *1 (N.D. Ill. July 10, 2001) (citing cases).

Where, as in this case, Title VII violations are alleged along with another federal claim,

Title VII's strict venue requirements take precedent over the general venue provisions for claims like the Equal Pay Act; to hold otherwise would make Congress's decision to make § 2000e-5(f)(3) the exclusive venue provision governing Title VII claims meaningless.  *See McCarthy v. KFC Corp.*, No. 84 C 994, 1984 WL 1048, at *3 n.8 (N.D. Ill. July 20, 1984) (noting in dicta, "§ 5(f)(3) is the exclusive venue provision for Title VII actions, and an assertion of pendant venue over the Title VII claim would effectively supercede that Congressionally mandated exclusivity.").  Therefore, if Plaintiffs do not satisfy the requirements for Title VII venue, venue is improper over the Title VII claim regardless of whether there is venue over the other claims under the general venue statute of § 1391.

Defendants claim that venue is improper in this district and thus the Amended Complaint must be dismissed pursuant to Rule 12(b)(3) of the Federal Rules of Civil Procedure.  There is no dispute that the employment records were not kept in the Southern District of Indiana.  However, Plaintiffs contend that the unlawful employment practice took place in Indiana and that she would have worked in the Southern District of Indiana had the retaliation not occurred.

Plaintiff need only satisfy one requirement under § 2000e-5(f)(3) for venue to be proper in the Southern District of Indiana.  Plaintiff does satisfy one of these—she would have been worked in the Southern District of Indiana but for the retaliation of the Defendants.  Plaintiff, through her Amended Complaint and her affidavit has alleged enough to show that venue is proper.  According to Hinds, the Institute equipped her with a home office.  (Hinds Aff. ¶ 8.)  It was from this home office that she performed her

-11-

duties for the Consortium.  (*Id.* at ¶ 11.)  Although she was provided "temporary office location[s]" in Washington, D.C., and New York (*Id.* at ¶ 9), there is no evidence that she would ever have been required to move permanently to either location.  The joint Defendants present no evidence to contradict Hinds's assertion that but for the Defendant's retaliation she would have worked in the Southern District of Indiana. (Although Starr claims in his affidavit that the Consortium has no office in Indiana, (Starr Aff. ¶ 13), to the extent that this contradicts Hinds's assertion, the court has to resolve the factual dispute in Hinds's favor at this stage of the litigation.)  Venue is proper pursuant to § 2000e-5(f)(3) and dismissal under rule 12(b)(3) is **DENIED**.

In the alternative to their 12(b)(3) motion, joint Defendants request the court to transfer this case to the Southern District of New York pursuant to 28 U.S.C. § 1404(a). Under § 1404(a),[9] a district court may transfer a case when the moving party demonstrates: "(1) venue was proper in the transferor district, (2) venue and jurisdiction would be proper in the transferee district, and (3) the transfer will serve the convenience of the parties and the witnesses as well as the interests of justice."  *Rohde v. Cent. R.R. of Ind.*, 951 F. Supp. 746, 747 (N.D. Ill. 1997); *accord Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 219 & n.3 (7th Cir. 1986); *Mleczek v. Aspen Skiing* Co., 07 C 0238, 2007 WL 1810530, at *1 (N.D. Ill Jun 20, 2007); *United Airlines, Inc. v. Mesa Airlines, Inc.*, 8

---

[9]  Section 1404(a) succinctly states in its entirety:

For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

F. Supp. 2d 796, 798 (N.D. Ill. 1998).  The moving party bears the burden to show "the transferee forum is clearly more convenient" than the original forum.  *Heller Fin., Inc. v. Midwhey Powder Co., Inc.*, 883 F.2d 1293 (7th Cir. 1989).  The court has found that the first factor applies and both parties seem to agree that the second factor applies; however, they argue about the third.

District courts in the Northern District of Illinois have set forth a list of five "private" factors to consider when deciding whether, as required by § 1404(a), "transfer will serve the convenience of the parties and the witnesses as well as the interests of justice."  They are: "(1) plaintiff's choice of forum, (2) the situs of the material event, (3) the relative ease and access to sources of proof, (4) the convenience of the parties and (5) the convenience of the witnesses."  *First Nat. Bank v. El Camino Res., Ltd.*, 447 F. Supp. 2d 902, 912 (N.D. Ill. 2006) (citing *Federated Dep't Stores, Inc. v. U.S. Bank Nat'l Ass'n*, No. 00 C 6169, 2001 WL 503039, at *2 (N.D. Ill. May 11, 2001)).  There are also public factors including "[1] the court's familiarity with the applicable law, [2] the speed at which the case will proceed to trial, and [3] the desirability of resolving controversies in their locale."  *Id.*  This court will first analyze the five private factors in order and then briefly address the public factors, which were not addressed by either party in their briefs.

Generally, the plaintiff's choice of forum is given substantial weight, especially when it is the plaintiff's home forum.  *Amoco Oil Co. v. Mobil Oil Co.*, 90 F. Supp. 2d 958, 960 (N.D. Ill. 2000).  Defendants argue that because none of the events that led to this lawsuit took place in the Southern District of Indiana the Plaintiff's choice of forum is

-13-

not so important.  *See First National*, 447 F. Supp. 2d at 912 ("[W]here the plaintiff's choice of forum is not the site of the material events, plaintiff's choice of forum is entitled less deference.").  Assuming that this is true—Hinds, after all, did have a home office in Indiana that was equipped by Defendant Institute and, according to her, worked in Indiana—this only means that substantial weight should not be given to her choice.  It does not weigh in favor of joint Defendants' choice.

The situs of material events, taking place all over the country, does not weigh in favor of the Southern District of New York (or at most weighs only slightly).  The subject of Hinds's purported employment was to set up the Consortium, which was incorporated in the state of Delaware.  (Laux Aff. ¶ 8.)  According to Starr, all meetings of the Special Committee took place either in New York or Washington, D.C.  The actual decision to remove her from the CEO position was made during meetings either on the phone or in New York.  (Starr Aff. ¶ 9.)  Starr, with whom Hinds claims she negotiated her employment contract, appears to be based in Chicago rather than New York.  In her EEOC charge, Hinds accuses a Special Committee member of kissing her without her consent at a Washington, D.C., hotel.  (Microsoft Ex. A, at 2.)  In short, New York appears to be one of many places across the country where events relevant to this suit took place and, thus, this factor tips negligibly toward the Southern District of New York.

The relative ease and access to proof does not weigh in the moving party's favor either.  The argument that records relevant to this case are in Chicago and New York is unavailing.  It is unclear which records are in Chicago and which are in New York.  Presumably, any inconvenience in moving documents from Chicago to Indiana will still

apply in moving documents from Chicago to New York. But Defendants have never claimed that it would be inconvenient to transport the documents to Indiana and in this day and age it is unlikely that it would be. For this reason, this factor is neutral.

The convenience of the parties clearly favors the Southern District of Indiana. Defendants' arguments to the contrary are unavailing. The factor relates to the "respective residences and abilities to bear the expense of trial in a particular forum." *Medi USA v. Jobst Inst., Inc.*, 791 F. Supp. 208, 210 (N.D. Ill. 1992). Hinds argues that it is less convenient for her, as an individual without the resources of a huge corporation, to travel to New York City and present her case there than it would be for Defendants to travel to Indiana and defend themselves. There can be little doubt that this is true—the Defendants do business in Indiana and are mostly large enough to defend themselves anywhere. But even if it were equally inconvenient this factor would be of no help to Defendants because a "motion to transfer cannot be used simply to shift the one party's inconvenience onto another party." *I.P. Innovations, L.L.C. v. Lexmark Int'l, Inc.*, 289 F. Supp. 2d 952, 955 (N.D. Ill. 2003).

Also, only two of the Defendants appear to be based in New York. Summonses were also sent to Delaware, Illinois, and Washington state. How much more convenient would New York be than Indiana given the fact that many of the Defendants would have

to travel to New York?  Defendants do not say.[10]  Because they bear the burden, this factor does not weigh in their favor.

Defendants have also not presented any evidence that the convenience of the witnesses will be better served in New York than in Indiana.  Defendants argue that "most of the other witnesses live in New York or Illinois."  But Defendants have to do better than say most witnesses do not live in Indiana.  To determine the convenience of the witnesses, the court examines "not only the number of witnesses located in the respective districts, but also the nature and quality of their testimony in relationship to the issues of the case."  *Volkswagen Aktiengesellschaft v. Dee Eng'g, Inc.*, No. 1:02-cv-1669-LJM, 2003 WL 1089515, at *3 (S.D. Ind. Mar. 4, 2003).  A court considers the inconvenience to third-party witnesses to be more important than party witnesses.  *First National Bank*, 447 F. Supp. 2d at 913.  "The party seeking transfer must specify the key witnesses to be called and make a generalized statement of their testimony.  The burden is on the moving party to show that the testimony of these particular witnesses is necessary to his case."  *Id.*

Defendants have not met this burden.  What percentage of the witnesses are in New York?  Are the most important witnesses in New York or some place else?  Are they party witnesses or third-party witnesses?  Defendants are silent on this.  It is

---

[10]  Defendants do argue that Hinds filed her EEOC charge in New York City and so should not complain about the inconvenience of New York City as a forum.  The court is unpersuaded by the notion that Plaintiff's initial attempt to resolve the matter in a forum convenient to some of the Defendants should preclude her from later arguing its inconvenience to her when that initial attempt failed.  Defendants provided no support for this argument and the court gives it no weight.

arguable that New Albany is more convenient to Illinois-based witnesses than New York City.  Defendants have not shown that this factor goes in anybody's favor.

Defendants and Plaintiffs make no argument about the public factors for transfer of venue and in total they do not weigh in favor of either forum.  This court is equally familiar with federal law as any other district court.  Further, the parties, in their briefs, have assumed that Indiana law applies to the breach of contract claims and defamation claim, which this court is more familiar with than the Southern District of New York.  The speed to trial factor weighs slightly in favor of transferring to the Southern District of New York.  The median time from filing to disposition for the twelve month period ending September 30, 2006, was 10.9 months for the Southern District of Indiana and 8.3 months for the Southern District of New York.  However, median time from filing to trial is almost identical, 26.0 months for the Southern District of Indiana and 25.7 months for the Southern District of New York.  Federal Court Management Statistics (2006), *available at* http://www.uscourts.gov/fcmstat/index.html.  No one forum is so related to the events in this litigation that would justify weighing in favor of the Southern District of New York.  The public factors do not weigh in favor of transfer.

In the end, no factor—private or public—weighs strongly for transferring venue, and the convenience of the parties weighs in favor of Hinds's chosen venue.  For this reason, the request for transfer pursuant to § 1404(a) is **DENIED** and this court will retain jurisdiction over this case.

III.     **Rule 12(b)(6) Standard of Review**

When considering a motion under Fed. R. Civ. P. 12(b)(6), the court must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff.  *Cole v. U.S. Capital*, 389 F.3d 719, 724 (7th Cir. 2004).  Under the federal notice pleading regime, "a complaint pleads *claims*, which is to say grievances." *Rapid Test Prods., Inc. v. Durham Sch. Servs., Inc.*, 460 F.3d 859, 861 (7th Cir. 2006).  It "need not set out either legal theories or comprehensive factual narratives."  *Id.* at 860.  However, the mere logical possibility of a set of facts entitling the plaintiff to relief does not guarantee a plaintiff's claim will survive a motion to dismiss under 12(b)(6). *Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955, 1964-65 (2007).  "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true."  *Id.* at 1965 (internal citations omitted).

A plaintiff's obligation to state the grounds for relief means that she cannot rely solely on "labels and conclusions" or "a formulaic recitation of the elements of a cause of action."  *Id.*  On the other hand, "the court is not required to ignore facts alleged in the complaint that undermine the plaintiff's claim."  *Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 597 (7th Cir. 2001).  A plaintiff can plead itself out of court if the complaint sets forth facts showing it cannot be entitled to relief.  *Thomas v. Farley*, 31 F.3d 557, 558-59 (7th Cir. 1994).

Defendants and Plaintiffs submitted materials outside the pleadings to address the 12(b)(2) and 12(b)(3) objections, which is allowed.  However, their analysis in places

-18-

implies that this material is being used to argue the 12(b)(6) motion.  (*See, e.g.*, Joint Defs.' Br. 16 (citing Starr Aff. ¶10); Pls.' Br. 9 (citing Hinds Aff. ¶ ¶ 37 and 38).)  While the court can look to matters outside the complaint for a 12(b)(2) or 12(b)(3) motion, the court may not do so in a 12(b)(6) motion.  *See* Fed. R. Civ. P. 12(b).  When matters outside the complaint are presented, the court may either disregard them or convert the motion into one for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  *Id.*  The court chooses to disregard the matters outside the Amended Complaint.  If Defendants want to rely on information outside the Amended Complaint, they may file a motion for summary judgment at any time.  Fed. R. Civ. P. 56(b).

This is not to say, however, that all of the exhibits submitted by the parties are matters outside the complaint.  Items referenced in the complaint that are central to Plaintiffs' case may be discussed in a 12(b)(6) motion.  *Venture Assoc. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431-32 (7th Cir. 1993).  For example, Hinds's EEOC charge may be discussed in deciding the motion to dismiss.  *See, e.g.*, *Flemming v. United Parcel Serv.*, No. 03 C 9391, 2004 WL 2314962, at *3 (N.D. Ill. Oct. 12, 2004); *Geist v. Glenkirk*, No. 01 C 0700, 2001 WL 1268574, at *2 n.3 (N.D. Ill. Oct. 23, 2001).

## IV.    Discussion on the Merits

Hinds alleges five claims against Defendants.  Three are federal claims and the remaining two are based on Indiana state common law.  The first two federal claims are brought under Title VII of the Civil Rights Act of 1964.  Because Defendants allege a common defense to both, the court will analyze these together.  The remaining federal

claim is under the Equal Pay Act.  The state claims are for breach of contract and defamation.

### A.      Title VII

Plaintiffs have alleged two separate Title VII claims against Defendants.  The first is for discrimination based on sex and the second is for retaliation.  Defendants first argue that none of them are proper defendants for the purposes of Title VII either because, in the case of the Consortium, they did not have the requisite number of employees or, in the case of the remaining defendants, they did not have an employment relationship with Hinds and there is no other reason for holding them liable. Additionally, Defendants argue that even if they are proper defendants, Plaintiffs failed to state a claim under Title VII.  The court will address Defendants' argument that they are not proper defendants first and then address the disparate treatment and retaliation claims.

### 1.      The Proper Title VII Defendants

Central to Defendants' argument for dismissal is their contention that they are not employers within the meaning of Title VII.  Liability in this case can only be found against defendants who meet the statutory definition of employer.  *See* 42 U.S.C. §§ 2000e-3, 2000e-4.  Title VII defines an employer as "a person in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such

a person." 42 U.S.C. § 2000e(b). An employee is defined as "an individual employed by an employer." 42 U.S.C. § 2000e(f).

Defendants argue that the Consortium cannot be held liable because it does not have the fifteen or more employees required and that the remaining defendants cannot be held liable because they never had an employment relationship with Hinds. Plaintiff counters that all of the Defendants should be liable because they "had significant reasons to set the [Consortium] up as a separate entity" and because the Defendants "directed the specific personnel actions of which she is complaining." (Pls.' Br. 12-13.)

The Seventh Circuit has explained that there are essentially five ways to be an employer for the purposes of Title VII. *See Worth v. Tyer*, 276 F.3d 249, 259 (7th Cir. 2001). First, a defendant is proper if it maintained an employment relationship with the plaintiff. *Id.* (citing *Knight v. United Farm Bureau Mut. Ins. Co.*, 950 F.2d 377, 380 (7th Cir. 1991)). The Seventh Circuit has explained that to determine whether an individual has an employment relationship as opposed to being an independent contractor, five factors should be analyzed. They are:

> (1) [T]he extent of the employer's control and supervision over the worker, including directions on scheduling and performance of work, (2) the kind of occupation and nature of skill required, including whether skills are obtained in the workplace, (3) responsibility for the costs of operation, such as equipment, supplies, fees, licenses, workplace, and maintenance of operations, (4) method and form of payment and benefits, and (5) length of job commitment and/or expectations.

*Id.* at 263 (quoting *Knight*, 950 F.2d at 378-79). It is the employer's right to control the individual's actions that is the most important of these factors. *Id.* (citing *Knight*, 950

F.2d at 378).  Only Grant Thornton and the Consortium can arguably be said to have had an employment relationship with Hinds.

But a defendant may be liable without having maintained an employment relationship directly with the Title VII plaintiff.  Liability may arise from the defendant's relation to an entity that did have an employment relationship with the plaintiff.  This can be shown in four ways.  First, a defendant is proper if "piercing the corporate veil" is called for because of a lack of observance of corporate formalities.  *Id.* (citing *Papa v. Katy Ind., Inc.*, 166 F.3d 937, 941 (7th Cir. 1999)).  Second, a defendant may be sued if "it takes actions for the express purpose of avoiding liability under the discrimination laws," *id.*, that is, if it incorporated as many cell corporations each too small to qualify as an employer under Title VII "to elude liability under the antidiscrimination law," *Papa*, 166 F.2d at 941.  Third, a suit is permissible when a defendant actually directed the discriminatory act.  *Worth*, 276 F.3d at 263 (citing *Papa*, 166 F.3d at 941).   Importantly, by aggregating the number of employees for all the corporations which qualify under these rules or had an employment relationship, these three methods can be used to find liability against a company too small to normally be held liable under Title VII.  *See Papa*, 166 F.2d 937.  Finally, a defendant may be liable through successor liability. *Worth*, 276 F.3d at 263 (citing *EEOC v. Vucitech*, 842 F.2d 936, 945 (7th Cir. 1988).

Plaintiff alleges that Grant Thornton had an employment relationship with her. She claims to have negotiated employment with Grant Thornton through Starr, a Grant Thornton managing partner, on a temporary basis until the Consortium was established and could pay her a salary through its own accounts.  (Am. Compl. ¶ 38.)  She was paid

by Grant Thornton in the meantime.  (*Id.* ¶¶ 38-39, 63.)  Hinds was also not responsible

for start up costs or expenses (although it was the Institute rather than Grant Thornton

that reimbursed her for start up costs).  (*Id.* ¶ 38.)  She received benefits such as life

insurance and "additional fringe benefits."  (*Id.*)  Further, it was Starr who informed her

that she would not be CEO of the Consortium (*Id.* ¶ 58) and who told her that she had

been terminated (*Id.* ¶ 63). These allegations, at least as they pertain to her status as

an employee, are "enough to raise a right to relief above the speculative level," which is

all that is required at this stage of the litigation. *Bell Atlantic*, 127 S.Ct. at 1965.

Joint Defendants' arguments to the contrary are unavailing.  Defendants argue

that Hinds has pled herself out of court by admitting in the Amended Complaint that no

payroll taxes were withheld from her payments from Grant Thornton.  (*See* Am. Compl.

¶ 82.)  But this is hardly a definitive factor precluding any chance of her proving an

employment relationship.  *Cf. Knight*, 950 F.2d at 380.  Hinds even alleges that Grant

Thornton breached its agreement with her by failing to withhold taxes (Am. Compl. ¶ 38,

82) and that the Internal Revenue Service agreed with her (*Id.* ¶ 83).  A corporation

cannot avoid Title VII liability simply by failing to withhold taxes for its employees.

This is not to say that as a matter of law Grant Thornton is an employer for the

purposes of Title VII liability.  It is very possible that Plaintiffs could fail through

discovery or other means to obtain enough evidence to demonstrate a genuine issue of

material fact on the question of whether Hinds was an employee or an independent

contractor.  It is also possible that even if there is a genuine issue of material fact, a trier

of fact, balancing the factors set forth in *Knight* and *Worth*, will conclude she was an

-23-

independent contractor.  But at this stage of the litigation, Plaintiff has alleged enough to survive a 12(b)(6) motion on this issue.

Hinds has not shown that the other Defendants are proper.  She argues that the remaining Defendants should be liable because they took "actions for the express purpose of avoiding liability under the discrimination laws."  But Hinds does not allege that Defendants incorporated as small companies to avoid Title VII liability.  In Plaintiffs' brief, Plaintiffs write "the Plaintiff is not contending [Defendants] have implemented some grand scheme to divide each of their businesses into millions of splinter corporations to avoid Title VII claims."  (Pls.' Br. 12.)  Unfortunately for Hinds, this is exactly what is required to qualify under this rule.  *See Papa*, 166 F.2d at 941 (noting "if the purpose of this splintered incorporation were to elude liability under the antidiscrimination law, the corporations should be aggregated to determine how many employees each corporation had").

Plaintiff's real concern is that Defendants controlled her employment situation. As the Seventh Circuit described in an age discrimination case: "Were the state pulling the strings in the background—telling the local school districts whom to hire and fire and how much to pay them—a point would soon be reached at which the state was the de facto employer and the local school districts merely its agents."  *EEOC v. Illinois*, 69 F.3d 167, 171-72 (7th Cir. 1995).  This proposition is also applicable in the Title VII context.  *See Papa*, 166 F.3d at 941.  Hinds claims that "Defendants had significant reasons to set the [Consortium] up as a separate entity *yet to retain control over it.*"

-24-

(Pls.' Br. 12 (emphasis added).)  In other words, she alleges that Defendants directed the discriminatory or retaliatory acts against her.[11]

Yet her allegation on this point is really just a conclusive statements that Defendants operated the Special Committee and the Consortium as a "de facto" corporation.  (Am. Compl. ¶ 24.)  She does state that Defendants "provided funding, office space and staff, handled executive decisions such as employment and terminations of employees, generated a product and service that was distributed, and held themselves out as the promoters integrally involved in this organization."  (*Id.* ¶ 25.)  But this, in itself, is not enough to make the Defendants liable.  *Cf. EEOC v. Illinois*, 69 F.3d at 171-72.  There is no allegation in the Amended Complaint that Defendants ordered her discrimination or ordered the actions that she claims were retaliation against her.  *See id.* at 172 ("There is no suggestion that the state knew about these two teachers or wanted them to resign.").

The mere fact that employees or agents of the Defendants served on the Special Committee or the Consortium does not, without more, prove the type of "string pulling" necessary to make them liable for discrimination under Title VII.  If this were so, every parent-subsidiary relationship would lead to liability under Title VII.

---

[11]  Plaintiff additionally asserts that Defendants ran the Consortium as a "de facto" corporation citing *Kerr v. WGN Continental Broadcasting Co.*, 229 F. Supp. 2d 880, 886 (N.D. Ill. 2002).  But this "de facto" corporation theory is, in reality, a theory that the defendant "directed the specific personal actions."  *Kerr* relies on *EEOC v. Illinois*, 69 F.3d 167 (7th Cir. 1995), which the Seventh Circuit in *Papa v. Katy Industries, Inc.*, 166 F.3d 937, 941 (7th Cir. 1999) cites as holding that parent corporations that direct discriminatory acts may be liable under Title VII.  Further, *Kerr* claims that it is consistent with *Papa.  Kerr*, 299 F. Supp. 2d at 887.

Hinds's brief asks the court to infer Defendants' control of the employment situation on dubious grounds.  Her Amended Complaint alleges that while she was on the Special Committee and later served as CEO of the Consortium she questioned "certain business practices" of the Defendant's businesses.  (Am. Compl. ¶ 44.)  It alleges that Special Committee members received audit information from Defendants "under the guise of formulating business strategies" but that the audit information was shared openly with Special Committee members even though some were in direct competition with the organizations whose information was being shared.  (*Id.* ¶ 45.)  Her brief states this a bit differently.  She claims that she questioned "expenditures which were being made, and the lack of record keeping for substantial amounts of money she saw being spent on behalf of [the Consortium]."  (Pls'. Br. 13.)  Either way, she uses these as evidence that "Defendants directed the specific personnel action of which she is complaining" (Pls.' Br. 13) because they had a motive for terminating her employment.

But if this is the reason why "personnel action" was taken, Hinds has no Title VII claim.  Title VII claims lie only for discriminatory actions based on "race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2.  If Plaintiff's evidence is taken to raise the inference that Defendants directed the adverse actions, then the actions were not based on her sex, but rather on her questioning of their business practices.

Plaintiff is left with nothing that would justify inferring that Defendants directed her discrimination.  Nor has she provided a basis for attributing liability to Defendants.  In the end, the Defendants are merely alleged to have provided seed money to a not-for-

-26-

profit corporation and to have employees who served on the board of that not-for-profit. This is not enough to make them liable as employers to Plaintiff.

It is also the case that the Consortium is not a proper defendant.  Hinds never alleges that the Consortium had the requisite number of employees to make it an employer for the purposes of Title VII.  Even though Grant Thornton had an employment relationship with Hinds before the Consortium, the allegations in the Amended Complaint are that Hinds never had an employment relationship with both at the same time.  None of the reasons for aggregating employee numbers stated in *Papa* apply to this case.  *See Papa*, 166 F.3d 937.  So even if the Consortium had an employment relationship with Hinds, it did not have the requisite number of employees and it is not liable under Title VII.  For these reasons only Grant Thornton can be liable under Title VII.

## 2.    Discrimination Based on Sex

Title VII of the Civil Right Act of 1964 prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment" because of the individual's sex.  42 U.S.C. § 2000e-2(a)(1).  It is also a violation of Title VII "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Oncale v.*

*Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

It would appear from Hinds's Amended Complaint that she is alleging a violation of Title VII because of discrimination in her compensation.  Hinds alleges Defendants "did not offer her the same compensation for similar work done by male counterparts as her same level of experience."  (Am. Compl. ¶ 65.)  It is not clear that she alleges a hostile work environment claim.  Defendants assume that she does and respond to it in their brief.  Plaintiffs do not explain the basis of Hinds's claim in their brief.  To the extent that Hinds might be asserting a claim of a hostile work environment, the court will address it in this section.

Joint Defendants only argument in their brief that Hinds has failed to state a claim for discrimination in compensation is that she failed to allege that the Consortium employed any male employees.  However, she has alleged that Grant Thornton employed at least one man on the Special Committee (*Id.* ¶ 19) and that the Defendants did not "offer her the same compensation for similar work done by male counterparts" (*Id.* ¶ 65).  This is enough to state a claim of discrimination in compensation against Grant Thornton.  For this reason, the motion to dismiss this count against Grant Thornton will be **DENIED**.

Joint Defendants' also argue that Hinds failed to state a claim of hostile work environment for two reasons.  First, they claim that Plaintiffs alleged no specific act of harassment.  They argue that the Amended Complaint contains only general allegations

-28-

rather than specific allegations sufficient to put them on notice of what they are

defending against.  Second, Defendants claim that the Amended Complaint fails to

allege "sufficiently severe or pervasive" conduct to reach the level of a Title VII violation.

Contrary to Defendants' assertion, Plaintiff did provide specific incidents in her

EEOC charge.  Defendants admit this in their brief, but insist that they are not relevant

because they took place after Hinds was told she would not be made CEO of the

Consortium.  But this is of no import; she alleges that she was still an employee of Grant

Thornton at this time even if she was not to become the CEO of the Consortium.  She

was terminated several weeks later.  (Am. Compl. ¶ 63.)  In the meantime, Grant

Thornton had an obligation to keep her work environment free of sexual harassment,

even if those harassing her were not Grant Thornton employees.  *See Dunn v. Wash.*

*County Hosp.*, 429 F.3d 689, 691 (7th Cir. 2005).

It is true that Plaintiffs have not alleged sufficiently severe or pervasive conduct

for her work environment to be hostile.  She alleges only that she received a disturbing

phone call from an unknown person and that she was kissed without her consent once

on September 8, 2004, before her employment relationship with Grant Thornton ended.

(Microsoft Ex. A, at 2.)  This is hardly sufficient for a hostile work environment claim.  *Cf.*

*Saxton v. AT&T*, 10 F.3d 526, 528-31, 34 (7th Cir. 1993) (several sexual advances from

supervisor "simply did not rise to the level of pervasive harassment as that term has

been defined by this court.").  The rest of her allegations are, as Defendants point out,

general.  For example, she claims that she was exposed to obscene and offensive

materials.  It is impossible for Defendants to respond to this without further information.

-29-

Therefore, the court will not address them.  Any claim for a hostile work environment must be **DISMISSED**.

### 3.    Retaliation Claim

Title VII also makes it unlawful "for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by [Title VII]."  42 U.S.C. § 2000e-3(a).  Hinds alleges that she complained about the disparity of compensation and about a hostile work environment.  (Am. Compl. ¶¶ 43, 54-55.)  She also alleges that she was removed as CEO of the Consortium in retaliation for these complaints.  (*Id.* ¶ 69.)  Just because her claims of discrimination based on a hostile work environment have been dismissed does not mean that her retaliation claims should be.  Title VII protects against retaliation for complaints made in good faith even if they turn out to be without merit.  *See Sweeney v. West*, 149 F.3d 550, 554 (7th Cir. 1998).

Defendants argue that there are two reasons why Plaintiff has failed to allege a claim for retaliation.  First, they claim that to the extent that Hinds claims that she was retaliated against because she complained of "certain business practices" her claim must fail.  Defendants are certainly correct that discriminating against employees who complain about business practices is not made unlawful by Title VII.  However, Plaintiff

alleges in her Amended Complaint that she was retaliated against for complaints about sexual discrimination (Am. Compl. ¶ 69), which is made unlawful by Title VII.[12]

Defendants also argue that this claim must be dismissed because Plaintiff has not alleged that her complaints were lodged prior to her being told she would not be CEO.  They ask, how can an action be retaliation for something that has not yet happened?  Unfortunately for Defendants' argument, the premise of this argument is not necessarily true.  Hinds explicitly states in her EEOC charge that she complained about the offensive phone call which took place August 18, 2004.  (Microsoft Ex. A, at 3.)  To be sure, it does not explicitly say that this complaint was made before the day she was told she would not be made CEO—September 4, 2004—but the inference is easy to make.  Hinds has properly alleged a retaliation claim against Grant Thornton, and Grant Thornton has not explained why it is not sufficient.  For this reason the motion to dismiss the retaliation claim is **DENIED**.

## B.    Equal Pay Act

The Equal Pay Act ("EPA") requires a plaintiff to show "(1) higher wages were paid to a male employee, (2) for equal work requiring substantially similar skill, effort

---

[12]  She does state in the EEOC charge that she "was severely retaliated against in her attempt to report gender discrimination *and questionable business practices* in the start up of [the Consortium]."  (Microsoft Ex. A, at 4 (emphasis added).)  While this statement can be used as evidence that the attempt to report questionable business practices was the real reason she was removed as CEO, it does not foreclose her retaliation claim at the 12(b)(6) stage.  *Cf. Speedy v. Rexnord Corp*, 243 F.3d 397, 401-02 (7th Cir. 2001) (noting that in a mixed motive affirmative defense "defendant may avoid liability only by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken the plaintiff's [protected contract] into account.").

and responsibilities, and (3) the work was performed under similar working conditions."
*Cullen v. Ind. Univ. Bd. of Trs.*, 338 F.3d 693, 698 (7th Cir. 2003).  Defendants argue
that Hinds has not alleged an employment relationship with any of the Defendants;
therefore, her EPA claim must be dismissed.  In the alternative, they argue that she has
not alleged the existence of a similarly situated male employee who was paid more.

The EPA is an amendment to the Fair Labor Standards Act ("FLSA").  To
determine whether there is an employment relationship for purposes of the FLSA, the
court looks to the economic reality behind the relationship to determine "whether the
individual had control over the alleged FLSA violation."  *See Davis v. B&S, Inc.*, 38 F.
Supp. 2d 707, 715 (N.D. Ind. 1998).  Another judge in this district listed the factors
relevant to this analysis as: "(1) the power to hire and fire the employee; (2) supervision
and control of the employee's work schedule or conditions of employment; (3)
determining the rate and method of payment for the hours worked; and (4) maintenance
of employment records."  *Braddock v. Madison County*, 34 F. Supp. 2d 1098, 1107
(S.D. Ind. 1998) (Hamilton, J.).  It is possible for Hinds to have more than one employer
under this analysis.  *See id.* (citing *Falk v. Brennan*, 414 U.S. 190, 195 (1973)).

In this case it is clear that, like the Title VII claims, Hinds has alleged that it was
Grant Thornton, although not the other Defendants, that had control over the alleged
violation.  According to the Amended Complaint, it was Mike Starr from Grant Thornton
with whom Hinds negotiated for her salary and it was Grant Thornton that paid her
salary.  (Am. Compl. ¶ 37-38.)  To the extent that Grant Thornton paid her a disparate
wage from a male employee doing similar work, it should be liable under the EPA.

-32-

There is also an allegation that the Consortium was to become her employer when it got its account together.  However, there is no allegation that this ever happened.  In fact, it appears from the Amended Complaint that Hinds always received her wages from Grant Thornton.  (*Id.* ¶ 63.)  There is no allegation that any other Defendant had this kind of control over Hinds's wages.

Hinds also alleges that she was paid less than her male counterparts on the Special Committee and the Consortium.  (*Id.* ¶ 73.)  Defendants argue that she has not alleged that the Consortium employed any male employees.  However, she did specifically allege that Grant Thornton had at least one male employee on the Special Committee—Mike Starr.  (*Id.* ¶ 19.)  The court expresses no opinion on the likelihood of the success of Plaintiff's claims, but it does not have to be likely that Plaintiff will prevail to survive a 12(b)(6) motion, only plausible.  *Bell Atlantic*, 127 S.Ct. at 1965-66.  However, Plaintiff has stated a claim against Grant Thornton; she claims that she was

not paid equal wages as male employees.[13]  For this reason, the motion to dismiss the

EPA claim is **DENIED**.

### C.      Breach of Contract Claim

The Amended Complaint alleges that Defendants breached the employment

contract between Hinds and them.  Defendants argue that this claim should be

dismissed because Hinds has failed to attach a copy of the employment agreement to

her Amended Complaint.  They claim that Hinds could not attach the employment

agreement because it did not exist and that Hinds has, at best, alleged an oral

agreement unenforceable under the Statute of Frauds.  Plaintiff does not address the

employment contract claim in her brief; all she argues is that BFC had a contract claim

against the Defendants.  As explained above, that claim has been severed.  To the

extent that Hinds has not forfeited her own breach of the employment contract claim, it

cannot survive for the reasons stated by the Defendants.

---

[13]   Joint Defendants argue in their brief that "[a]ny alleged denial of 'economic opportunities' other than wages as alleged in the Amended Complaint is not protected by the Act."  (Joint Defs.' Br. 16.)  Clearly, only wages are covered by the EPA.  *See* 29 U.S.C. § 206(d)(1).  However, the definition of wages is an expansive one.  The Code of Federal Regulations states:

> [T]he term 'wages' generally includes all payments made to or [on behalf of] an employee as remuneration for employment. The term includes all forms of compensation irrespective of the time of payment . . . and whether called wages, salary, profit sharing, expense account, monthly minimum, bonus, uniform cleaning allowance, hotel accommodations, use of company car, gasoline allowance or some other name. Fringe benefits are deemed to be remuneration for employment.

29 C.F.R. § 1620.10.  At this early stage of the litigation, it is unnecessary for the court to decide what is and is not "wages" for the Plaintiff's EPA claim.

While the Statute of Frauds is an affirmative defense, if an affirmative defense is clear from the face of the complaint it may be asserted in a 12(b)(6) motion.  *Berco Invs., Inc. v. Earle M. Jorgensen Co.*, No. 94 C 3961, 1996 WL 388463, at *3 (N.D. Ill. 1996) (citing Wright & Miller, Federal Practice and Procedure § 1349).  The Amended Complaint never explicitly states that the contract between the parties was oral.  It does, however, state that Hinds had a two-year right to renew, which would make the Statute of Frauds applicable.  *See Whiteco Indus. v. Kopani*, 514 N.E.2d 840, 842-43 (Ind. Ct. App. 1987).  No written contract is attached to the Amended Complaint.  Although the Joint Defendants point out in their brief this deficiency in Plaintiffs' complaint, Plaintiffs make no mention of this claim in their response.  The court takes this silence as a concession that there is no written contract and the Statute of Frauds bars enforcement of the promise.  For this reason the claim is **DISMISSED**.

### D.    Defamation

Plaintiff also alleges a defamation claim against the Defendants.  Plaintiff claims that the Special Committee and the Consortium came upon "confidential information about Hind's [sic] prior employment" and presented this information to others "in [a] fashion" which defamed Hinds's character.  (Am. Compl. ¶¶ 90-91.)  Defendants argue that Hinds must do better than generally allege that there was defamation; she must explain what words of Defendants defamed her and when and where they were published.  Defendants also argue that the Amended Complaint fails to allege that the

statements made by Defendants are false.  Hinds responds that she is subject to the terms of a confidentiality agreement and so cannot elaborate.

For the proposition that averments of time and place must be made to state a claim for defamation, Defendants cite *Perry v. Hartz Mountain Corp.*, 537 F. Supp. 1387, 1391 (S.D. Ind. 1982).  In a previous case, this court explained why it disagrees with the holding of *Perry*.  *See Magrall, LLC v. Crane Co.*, No. IP 02-0478-C-T/L, 1:03-cv-1255-JDT-TW, 2004 WL 2750252 (S.D. Ind. 2004) (Tinder, J.).  It is unnecessary to go into detail reexplaining why because Defendants are correct that Plaintiffs do not allege that the statements made were false.  Technically speaking, a statement's falsity is not part of the prima facie case for defamation.  *Cf. Loving v. Thomas*, 805 N.E.2d 442, 447 (Ind. Ct. App. 2004) (listing elements of prima facie case).  However, in Indiana the truth of a statement is a defense to defamation.  *See N. Ind. Public Service Co. v. Dabagia*, 721 N.E.2d 294, 307 (Ind. Ct. App. 1999).

Under a notice pleading regime, Plaintiffs would not have to allege the non-existence of a defense, *U.S. Gypsum Co. v. Ind. Gas Co.*, 350 F.3d 623, 626 (7th Cir. 2003); however, it is clear from the face of the Amended Complaint that the defense is applicable, *see Trevino v. United Pac. R.R.*, 916 F.2d 1230, 1234 (7th Cir. 1990).  Plaintiffs describe the statements made by Defendants as "confidential information about Hind's [sic] prior employment."  This wording gives the unmistakable impression that the material, while not publicly known, was true.  Plaintiffs' brief does not address Defendants' argument that the truth defense applies.  Further, any claim that the material is not false is belied by Hinds's assertion that she could not disclose the

particulars of what was said without violating a confidentiality clause.  It is hard to imagine a confidentiality clause preventing someone from disclosing false statements.[14] For this reason, the claim is **DISMISSED**.

## V.      Award of Costs and Fees

Title VII provides that "In any action or proceeding under this title the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee." 42 U.S.C. § 2000e-5(k).  A prevailing defendant may obtain attorney's fees when a court finds that "plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith."  *Christianburg Garment Co. v. EEOC*, 434 U.S. 412, 421 (1978).  Yet "[t]here is a significant difference between making a weak argument with little chance of success . . . and making a frivolous argument with no chance of success."  *Khan v. Gallitano*, 180 F.3d 829, 837 (7th Cir. 1999).[15]

Although there are exceptions to the rule, a plaintiff must file a charge with the EEOC and obtain a right to sue letter against a defendant before bringing an action in federal court under Title VII.  *See Doe v. Oberweis Dairy*, 456 F.3d 704, 708 (7th Cir.

---

[14]  The extent to which the disclosure of true statements could be the basis of a tort in Indiana is uncertain.  It is possible, although far from certain, that dissemination of true statements could lead to an "invasion of privacy" suit.  Indiana courts have explained, however, that these invasion of privacy suits reach different interests than defamation suits.  "Defamation reaches injury to reputation, while privacy actions involve injuries to emotions and mental suffering." *Lovings*, 805 N.E.2d at 446 (citing *Near E. Side Cmty. Org. v. Hair*, 555 N.E.2d 1324, 1335 (Ind. Ct. App. 1990)).  Hinds has only alleged an injury to her reputation in her Amended Complaint.  (Am. Compl. ¶ 91.)

[15]  Although *Khan* was in the 42 U.S.C. § 1983 context, the analysis is the same as Title VII.  *See Hughes v. Rowe*, 449 U.S. 5, 14-15 (1980) (extending *Christianburg* analysis to § 1983).

2006).  Microsoft was not named in Hinds's EEOC charge; for this reason, it argues that Plaintiffs' Title VII claims were frivolous and warrant the awarding of attorney's fees and costs.  Presumably, Microsoft is only asking for the costs associated with the Title VII claims because the remaining claims do not require exhaustion of remedies.

Plaintiffs do not directly respond to the argument that Microsoft should be awarded fees and cost, but do respond to Microsoft's argument that it should be dismissed even though it was not named in the EEOC charge.  In its entirety, Plaintiffs' argument is:

> An EEOC charge was not filed specifically naming Microsoft. However, a charge was filed naming [the Consortium].  Under the theory of a de facto corporation or integrated enterprise as previously argued, Microsoft should be considered as an employer in any matters related to [the Consortium].  Therefore, until the issue of who Hind's [sic] employer is decided, Microsoft should not be dismissed from this action.

(Pls.' Br. 17.)  In other words, Plaintiffs argue that because Microsoft can be considered an employer, it should not matter that it was not named in the EEOC charge.

But this is a frivolous argument without any chance of success.  It is black letter law in the Seventh Circuit that a "parent organization not named in the plaintiff's EEOC charge must be dismissed from the suit unless the plaintiff can show that the parent had notice of the claim against it, as opposed to its subsidiary, and had an opportunity to conciliate on its own behalf."  *Olsen v. Marshall & Ilsley Corp.*, 267 F.3d 597, 604 (7th Cir. 2001) (citing *Schnellbaecher v. Baskin Clothing Co.*, 887 F.2d 124, 127 (7th Cir.

1989)).  In other words, a parent-subsidiary relationship does not mean that naming a subsidiary in an EEOC charge allows suit against an unnamed parent.

Yet this is the only argument that Plaintiffs give that Microsoft should not be dismissed.  They might argue that they also allege that there was a "de facto" corporation, in other words, that Microsoft ordered the discrimination as opposed to merely having a relationship like parent-subsidiary.  That is unavailing.  If complete ownership of a corporation is not enough to make them amenable to suit without naming them in the EEOC charge, then certainly simply having a board member is not enough.

Microsoft wrote in its brief that Plaintiff could not proceed with its claim against them because they were not named in the EEOC charge.  It further argued that it should be awarded fees because any argument that Microsoft could be sued despite not being named in the charge was frivolous.  In response, instead of explaining why it had a legitimate, even if ultimately losing, argument or simply dropping the Title VII claims against Microsoft, Plaintiff presented a short, frivolous argument without any citations.  For this reason, the court awards attorney fees to Microsoft solely for its cost in defending the Title VII claims.

## VI.    Conclusion

The court will sever the contract claim of BFC Solutions against the Defendants because it is not part of the same operative set of facts that led to the other claims.  However, BFC Solutions has failed to plead facts establishing this court's subject matter

jurisdiction.  BFC Solutions has **TWENTY DAYS**, or until **August 29, 2007**,  to cure this deficiency in its complaint or the court will dismiss its cause of action.

Only Grant Thornton is a proper defendant for Title VII and Equal Pay Act purposes.  Further, Hinds properly alleged these claims against Grant Thornton.  For this reason the motion to dismiss is **DENIED** on those claims.  The Title VII and Equal Pay Act claims against the remaining defendant and the remaining state law claims against all Defendants will be **DISMISSED**.

The court further finds that the Title VII claim against Microsoft was frivolous because there was no legitimate argument to pursue the claim against Microsoft despite not having named them in the EEOC charge.  Attorneys for Microsoft shall have **FOURTEEN DAYS** to file and serve a Bill of Costs and Petition for Attorney's Fees pursuant to Local Rule 54.1.

ALL OF WHICH IS ENTERED this 10th day of August 2007.

_____
John Daniel Tinder, Judge
United States District Court

-40-

Copies to:

Magistrate Judge William G. Hussmann, Jr.

M. Fayez Hussain
GRANT THORNTON LLP
175 W. Jackson Blvd.
Chicago, IL 60604

Steven P. Langdon
FROST BROWN & TODD, LLC
slangdon@fbtlaw.com

Joseph W. Muccia
THELEN REID BROWN RAYSMAN MILLSTEIN FELDER & STEINER LLP
jmuccia@brownraysman.com

Sandra H. Perry
BOSE MCKINNEY & EVANS, LLP
sperry@boselaw.com

David Brian Ritter
NEAL GERBER & EISENBERG LLP
dritter@ngelaw.com

Susan Elaine Sparks
MONTGOMERY ELSNER & PARDIECK
ssparks@meplegal.com

William Michael Sunkel
WINSTON & STRAWN LLP
wsunkel@winston.com

David L. Swider
BOSE MCKINNEY & EVANS, LLP
dswider@boselaw.com

Marni Elyse Weiss
THELEN REID BROWN RAYSMAN MILLSTEIN FELDER & STEINER LLP
jmuccia@brownraysman.com